**Jodie BEAR, Petitioner,**

v.

**VOLUNTEERS OF AMERICA, WYOMING, INC., and Jerry Fletcher, Respondents.**

**No. 97–13.**

Supreme Court of Wyoming.

Sept. 14, 1998.

Michael K. Shoumaker and Rene Botten, Sheridan, for Petitioner.

H.W. Rasmussen of Badley & Rasmussen, P.C., Sheridan, for Respondents.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and TAYLOR,* JJ.

GOLDEN, Justice.

Following her discharge from employment with Volunteers of America, Wyoming, Inc. (VOA), Appellant Jodie Bear (Bear) brought suit claiming the discharge breached her employment contract, violated the terms of a federal grant and violated her civil rights. VOA was granted partial summary judgment, and this Court granted Bear's petition for review of that decision.

We affirm.

## ISSUES

Bear presents these issues on appeal:

Breach of Contract Claim

* Chief Justice at time of oral argument.

1. There was a genuine issue of material fact that Jodie Bear was an "at-will" employee.

A. Ms. Bear had an express contract by virtue of the employment letter sent to her by Jerry Fletcher.

B. Ms. Bear was a third-party beneficiary by virtue of the federal grant.

C. Ms. Bear had an implied contract under Volunteers of America, Wyoming, Inc.'s personnel policies.

Interference with a Contract

2. There was a genuine issue of material fact whether Jerry Fletcher, an agent of Volunteers of America, Wyoming, Inc., interfered with Ms. Bear's contract for his own advantage.

Violation of Due Process Rights

3. There was a genuine issue of material fact whether Ms. Bear had a property interest in her job that entitled her to a deprivation of property claim.

Promissory Estoppel

4. There was a genuine issue of material fact whether Volunteers of America, Wyoming, Inc. and Jerry Fletcher made specific promises to Ms. Bear upon which she detrimentally relied, and changed her position?

Breach of Good Faith and Fair Dealing

5. There was a genuine issue of material fact on whether Volunteers of America, Wyoming, Inc. and Jerry Fletcher fired Ms. Bear in retaliation for "blowing the whistle" on their misappropriation and misuse of federal grant funds and breached the Covenant of Good Faith and Fair Dealing.

Punitive Damages

6. There was a genuine issue of material fact as to whether Volunteers of America and Jerry Fletcher can be held liable for punitive damages.

VOA restates the issues to be:

1. Was Jodie Bear an "at will" employee of Volunteers of America?

2. If Jodie Bear is found to be an "at will" employee can she state a cause of action on any of the seven theories set forth in her Complaint?

## FACTS

In 1994, Jerry Fletcher, Chief Operating Officer (COO) and executive director of VOA, interviewed Bear for the position of probation program director at a salary of $21,000 per year. Bear considered this salary too low and contends the two agreed that if Bear set up a probation department to provide probation services to juveniles in the municipal, county, and district court systems in Sheridan County and secured permanent funding, her salary would be raised. Fletcher sent Bear a form letter entitled "Employment Letter" which set her hiring date as December 21, 1994, named her salary and identified her employment status to be probationary for a six month period at which time she would be reclassified as a permanent employee. Referring Bear to a handbook containing the personnel policies for the organization for further information, Fletcher signed the letter as executive director. Bear was given and read the VOA Personnel Policies but states that she was not given a first page containing a disclaimer.

Federal law requires states to provide juveniles with services established under the Juvenile Justice and Delinquency Prevention Act of 1974 and provides federal grants to do so. Under Bear's direction, VOA secured a $253,000 federal grant which, beginning in October of 1995, funded probation services in Sheridan County. The grant specified that, as the designated project director, Bear could not be removed without compelling reasons and without the prior concurrence of the Office of Juvenile Justice and Delinquency Prevention (OJJDP).

Although the application for the grant set Bear's salary at $28,000 per year, Bear states that Fletcher told her that he intended to raise her to $23,000 per year and increase the salary of his wife, also a VOA employee, by $5,000. Difficulties between Bear and the Fletchers had already developed during the time before the receipt of the grant, and apportionment of the funds from the grant appears to have escalated tensions. Other incidents occurred, and Bear approached a VOA board member and stated her intent to file a grievance. According to a Board mem-

ber, a special board meeting was held on January 10, 1996, without the presence of Fletcher to address difficulties the Board was encountering regarding Fletcher's management of VOA. It was decided that Fletcher would be ordered not to terminate any personnel from VOA without the Board's prior approval, and one member suggested that Bear be asked not to file her grievance until this protection was in place.

In a February 9, 1996, letter to a member of VOA's board of directors, Bear stated that she learned from members of the community that she was soon to be fired and had received letters of support from judges and others she routinely worked with regarding juvenile issues. Sometime after that, Bear wrote a lengthy grievance to the VOA board describing a number of incidents involving the Fletchers which she stated illustrated that the Fletchers attempted to divert grant funds from her program to other VOA programs and to themselves in violation of the terms of the grant; misused expense money, vacation time, and compensation time; had caused the wrongful dismissal of an employee; and were withholding her mail and phone messages from her. On March 28, 1996, the board instructed Fletcher not to receive mail other than his own; to provide Bear with monthly financial statements; to have his and the program director's signatures on all expense vouchers after all questions regarding the expense were resolved; to clarify the responsibilities of Fletcher and Bear regarding the program; and take steps to improve communication between the two. The board also agreed to review four vouchers questioned by Bear.

Fletcher received a call in early August 1996 from a citizen of the community claiming that Bear was accusing Fletcher and VOA of misusing funds. He informed the Board and, at their direction, received an affidavit from the citizen describing Bear's actions. The Board authorized Fletcher to terminate Bear's employment, and on August 6, 1996, Fletcher delivered a letter of employment termination to Bear which stated that her discharge was because of these accusations, her stated intention to establish a probation service independent of VOA, and

her threatening and coercing people and violating confidentiality of youth in the probation program. Fletcher had prepared a letter of resignation for Bear to sign, but she refused. She requested a hearing before the Board, which agreed to accept and review a written grievance from her but denied her request to appear before them with or without legal representation.

Bear filed suit against VOA in district court on September 4, 1996, claiming violation of freedom of speech under 42 U.S.C. § 1983; deprivation of property without due process of law under 42 U.S.C. § 1983; breach of contract; promissory estoppel; breach of the implied covenant of good faith and fair dealing; and punitive damages. Her complaint contained a claim against Fletcher for intentional interference with a contract. VOA and Fletcher moved for summary judgment and, following a hearing, the district court granted summary judgment in favor of Fletcher and VOA on all claims except for her freedom of speech claim. Bear filed a petition for writ of review with this Court, which was granted on January 28, 1997.

## DISCUSSION

### Standard of Review

Our review of a grant of summary judgment is the same as the district court. The movant has the burden of clearly demonstrating that there are no genuine issues as to any material fact and the movant is entitled to judgment as a matter of law. *Davis v. Wyoming Medical Center, Inc.*, 934 P.2d 1246, 1250 (Wyo.1997). Once a prima facie showing is made, the burden shifts to the party opposing the motion to present specific facts showing that a genuine issue of material fact does exist. *Id.; Clark v. Industrial Co. of Steamboat Springs, Inc.*, 818 P.2d 626, 628 (Wyo.1991). We examine the record from the vantage point most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may fairly be drawn from the record. *Id.*

*Employment Contract Claims*

It is now settled law in Wyoming that employment is presumed to be at will; however, that presumption can be modified by an express or an implied-in-fact agreement. *Brodie v. General Chemical Corporation*, 934 P.2d 1263, 1265 (Wyo.1997); *Loghry v. Unicover Corporation*, 927 P.2d 706, 710 (Wyo.1996). An employment handbook or personnel policies, letters of employment, performance evaluations and an employer's course of dealing may supply terms for an implied-in-fact employment contract which requires termination for cause only unless it contains a sufficient disclaimer. *Loghry*, 927 P.2d at 710; *Lincoln v. Wackenhut Corp.*, 867 P.2d 701, 703 (Wyo.1994). The test is whether there has been an objective manifestation of assent to an employment contract containing a job security provision. *Davis*, 934 P.2d at 1249. In this case, Bear claims that the VOA personnel policies, the employment letter, her performance evaluation, and the federal grant modified her at will status to one providing that she could not be dismissed from her employment without cause.

The VOA personnel policies contained a disclaimer that Bear challenges as insufficient. Our review of it confirms that it is legally sufficient to preserve her at will status. The disclaimer of contract language is on page one, is capitalized and it clearly and unambiguously states that the policies are not a contract of employment, employment may be terminated at any time for any reason, and the employer has reserved the right to alter the policies' language at any time. *Lincoln*, 867 P.2d at 703–04; *Davis*, 934 P.2d at 1252. However, that legally sufficient disclaimer states in part:

> Finally, no employee, manager, minister or officer of Volunteers of America of Wyoming, Inc., other than the COO or director, has any authority to offer, or enter into, an agreement for employment for a specific period of time with Volunteers of America of Wyoming, Inc., employees or applicants, or to make any agreement contrary to the above policy.

In *Loghry*, we held that this language in a disclaimer meant that only the company em-ployee specified could alter at will status. *Loghry*, 927 P.2d at 711.

Bear was hired on December 21, 1994. Her hiring followed a negotiation process in which she and Fletcher, COO and director of VOA, verbally agreed that if she accomplished certain things she would receive a higher salary and "permanent employment" following a six month probationary period. Fletcher sent Bear an "Employment Letter" which stated that following a satisfactory probation she would receive a letter of regular employment. When she began working, Bear was given a copy of the June 1994 personnel policies. Bear did accomplish what she had promised and received a raise in salary and, according to her evaluation conducted by Fletcher, was accorded "permanent employment." Bear contends this letter and the evaluation by the director alter her at will status.

In *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 218 (Wyo.1994), this Court stated:

> We hold that a claim by an employee that the employer promised "permanent" employment does not alter the at will presumption without additional consideration supplied by the employee or explicit language in the contract of employment stating that termination may only be for cause.

*Wilder* determined that parties could choose to provide that termination is for cause even in a contract of employment of indefinite duration. *Id.* For Wilder, the court found he had not provided additional consideration by changing employers, but ruled a question of fact existed regarding a promise to discharge only for cause in the words "as long as I did the work that was required." *Id.*

Bear's accomplishments which resulted in her increased salary cannot be considered additional consideration. She simply did the job she was hired to do in exchange for compensation. The question is whether the employment letter and evaluation following her negotiations with Fletcher, who is authorized by the disclaimer to alter at will status, present the same situation as that which occurred in *Wilder* and establish a contract for indefinite duration but requiring good cause for discharge. If the use of the

term "permanent employment" in documents signed by Fletcher is not sufficiently explicit to change VOA's unfettered right to discharge at any time and without cause, then this is a situation which simply falls under the rule of *Allen v. Safeway Stores, Inc.* 699 P.2d 277, 282 (Wyo.1985), where this Court said that the employee's "[s]ubjective understandings and expectations do not establish an employment contract with a definite term of duration." *Wilder,* 868 P.2d at 229 (Golden, J., concurring and dissenting); *Mobil Coal Producing, Inc. v. Parks,* 704 P.2d 702, 704 (Wyo.1985) (recognizing an implied employment contract). Unlike *Wilder,* we do not have any language explicitly stating an intent to promise job security to Bear, and we hold that her employment status was at will. *See Davis,* 934 P.2d at 1249–52.

■ Bear also contends that she did not receive the disclaimer when she was hired, and it is, therefore, ineffective for her. In her affidavit dated December 2, 1996, Bear states that she read and relied on these policies. She references to Exhibit B, which is a copy of the policies, including the disclaimer page. She says, "To my knowledge, I was never ·asked to sign a copy of these personnel policies until March 1996 when Julie Hutson asked me to sign the March 1996 version, which I refused." It is unclear from this record whether Bear had not read the disclaimer and was unaware of it or had read the disclaimer but had not signed one. Either of these situations presents the question of whether it matters if the employee knows of the particulars of an employer's distributed policies. We conclude it makes no legal difference.

In *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 643 A.2d 554, 558–62 (1994), the New Jersey Supreme Court, a leading court in employment law, said that the fired employee did not have to know of either "for cause" provisions or disclaimer provisions in order to be covered by them. According to that court, the critical inquiry was whether the employer's manual

> as a whole, regardless of its actual receipt by the employee, gives rise to an implied contract of employment because of its terms—including most importantly those

relating to employment security—and its wide distribution. . . .

> An employee may not select among the provisions of a[sic] employment manual to determine which provision should give rise to enforceable contractual obligations. If Nicosia "seeks to rely on provisions in the employee handbook as the source of an implied contract of employment, then he must accept the agreement as a whole with its attendant responsibilities." ... In this case, then, the eleven-page excerpt [which covered disciplinary procedures] must be considered in light of the entire [160–page] manual, including the disclaimer [which appeared in the first paragraph on the manual's first page], even if Nicosia was unaware that the excerpt was part of a larger employment policy document.

*Id.* 643 A.2d at 559 (citation omitted). The court proceeded to review the disclaimer, of which the fired employee was unaware but which had been distributed to the workforce, and found it deficient. *Id.* at 559–62. The *Nicosia* court also decided *Woolley v. Hoffmann–La Roche,* 99 N.J. 284, 491 A.2d 1257, *modified,* 101 N.J. 10, 499 A.2d 515 (1985), which we have favorably cited in some of our employment decisions. In *Woolley* the court quoted favorably from *Toussaint v. Blue Cross & Blue Shield of Mich.,* 408 Mich. 579, 292 N.W.2d 880, 892 (1980), which said that it does not matter that the employee knows nothing of the particulars of the employer's distributed policies. *Woolley,* 491 A.2d at 1268. Reliance is *presumed;* a strict contractual analysis is not made because otherwise some employees would be protected and others would not. *Id.* at 1268 n. 10. *And see Labus v. Navistar Intern. Transp. Corp.,* 740 F.Supp. 1053, 1060–62 (D.N.J.1990). We are satisfied that VOA distributed the manual, including the first-page disclaimer, to its newly hired employees. Whether or not the employees read or signed it makes no legal difference. The disclaimer, as well as all provisions of the entire handbook, are binding on the employer and the employee, even if the employee is unaware of them.

■ Finally, Bear asserts she was a third party beneficiary of the contract between

VOA and OJJDP because of the following contract language:

> The Project Director and key program personnel designated in the application shall be replaced only for compelling reasons and with the prior concurrence of the OJJDP. Approval of the successor is contingent upon submission of a resume and verified statement of most recent salary. Changes in other program personnel require only notification to the OJJDP with the same documentation as for the Project Director unless otherwise designated in the award document. Prior approval is required for Advisory Board members and consultants used in the project.

Bear was designated as the project director under the grant, and she contends this is sufficient to establish that she was a third-party beneficiary of the contract.

> There is no question that a promise may be made to one person for the benefit of another and a third-party beneficiary may enforce his rights under a contract, although not a party to nor specifically mentioned in the contract; but there is more to it than that. An outsider claiming the right to sue must show that it was intended for his direct benefit. Otherwise he may be only an incidental beneficiary because the compelling provisions of a contract require that his claims be satisfied in order to protect another. However, an incidental beneficiary acquires no right of action against the promisor or promisee.

*Wyoming Machinery Co. v. U.S. Fidelity and Guaranty Co.*, 614 P.2d 716, 720 (Wyo. 1980) (citing *Peters Grazing Assoc. v. Legerski*, 544 P.2d 449 (Wyo.1975); *Graham and Hill v. Davis Oil Company*, 486 P.2d 240 (Wyo.1971)).

In *Richardson Associates v. Lincoln–Devore, Inc.*, 806 P.2d 790 (Wyo.1991), we considered RESTATEMENT (SECOND) CONTRACTS § 302 (1981) in determining whether a third person was an intended third-party beneficiary of a contract:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Richardson Associates*, 806 P.2d at 807. The contract between OJJDP and VOA addressed all aspects of establishing and administering the juvenile services to be funded by the grant. The purpose of the contract was to protect the grant funds. The one provision of the contract in this case addressing discharge of the project director was not intended to benefit that director, but was intended to further effectuate the protection of the grant funds by permitting OJJDP some control over the quality of personnel. Bear is an incidental beneficiary, not an intended beneficiary, and acquires no right of action against VOA.

*Promissory Estoppel*

 Promissory estoppel claims must show a clear and definite agreement; proof that the party urging the doctrine acted to its detriment in reasonable reliance on the agreement; and the equities support the enforcement of the agreement. *Loghry v. Unicover Corp.*, 927 P.2d 706, 710 (Wyo.1996). As we have just established, Bear was an at will employee, and, according to the disclaimer in the personnel policies, only the COO or the executive director had authority to alter this status. Bear recites six promises of job security that were made to her that require enforcement.

The first two are based upon the "permanent employment" promise made by Fletcher in the interview and employment letter. She claims that she detrimentally relied on this promise as one of job security and accepted employment with VOA and is substantially harmed if the promise is not enforceable. The analysis and conclusion of the legal effect of this term articulated in the preceding section does not change because the theory of recovery changes. It remains applicable

that "permanent employment" without more is not a promise of job security.

Next, Bear references a promise by the VOA board attorney that filing the grievance would not result in her discharge and a promise by the VOA that caused her to withhold filing her grievance until strengthened personnel policies were enacted that would safeguard her employment. As already discussed, only the COO or director of VOA was authorized to make any promises to Bear which would alter her at will status. Similar facts were presented in *Loghry,* and this Court held that where a disclaimer clearly specified the person and method of altering at will status, it is unreasonable for an employee to rely upon a promise of job security by another person or another method. *Loghry,* 927 P.2d at 711. In this case, the specific disclaimer language obligates us to determine that it was unreasonable for Bear to rely on the promises of anyone but Fletcher.

Finally, Bear claims that after she filed her grievance and the Board acted upon it, the Board promised that she would see financial statements and Fletcher promised her that "[he would] not make any decisions that affect the probation program without first discussing it with [Bear]." Although she states that she detrimentally relied upon these promises, it is unclear how she did or what damages she suffered when the promises were not kept. Demonstrating detrimental reliance and damages are necessary elements for establishing a claim of promissory estoppel. Because they are not demonstrated and our review of the record does not enlighten us, it appears that we can not further consider the issue.

*Breach of the Covenant of Good Faith and Fair Dealing*

Bear bases this claim on *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211 (Wyo.1994), which recognized a tort claim of breach of the implied covenant when there is a special relationship of trust and reliance. *Id.* at 221. *Wilder* established that all contracts of employment contain an implied covenant of good faith and fair dealing. *Id.* at 220. However, Bear contends that the basis of her claim is her discharge in retaliation for "whistleblowing and public policy." This Court discussed the "retaliatory" tort claim in *Allen v. Safeway Stores, Inc.,* 699 P.2d 277, 284 (Wyo.1985), and adopted it in *Griess v. Consolidated Freightways Corp. of Delaware,* 776 P.2d 752 (Wyo.1989). The theories of the tort claim of retaliatory discharge in violation of public policy and the tort claim of breach of the implied covenant are distinct and not to be confused.

The special relationship of this tort can arise from "separate consideration, common law, statutory rights, or rights accruing with longevity of service...." *Wilder,* 868 P.2d at 221. Our review of the record indicates no evidence of any factor that would present a genuine question of material fact on whether there was a special relationship of trust and reliance between VOA and Bear, and summary judgment is affirmed.

*Interference With Contract*

Bear asserts that the district court erred by granting summary judgment in favor of Fletcher on her claim for intentional interference with a contract. The district court ruled: "Jerry Fletcher is an agent of VOA. Although Defendant Fletcher suggested terminating [Bear's] employment, VOA approved the dismissal. A separate claim against Fletcher is inappropriate herein."

Intentional or tortious interference with a contract is defined as:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

RESTATEMENT (SECOND) OF TORTS § 766 at 7 (1979). *See also Davenport v. Epperly,* 744 P.2d 1110, 1111–12 (Wyo.1987); *Toltec Watershed Improvement District v. Johnston,* 717 P.2d 808, 813 (Wyo.1986). In Wyoming, the plaintiff has the burden of proving the four elements of intentional or tortious interference with a contract: (1) that a valid

contractual relationship existed; (2) that the interferer knew of the contractual relationship; (3) that intentional and improper interference induced or caused a breach or termination of the contractual relationship; and (4) that the party whose relationship was disrupted as a result of the breach was damaged. *Examination Management Services, Inc. v. Kirschbaum,* 927 P.2d 686, 697 (Wyo. 1996); *Ames v. Sundance State Bank,* 850 P.2d 607, 611 (Wyo.1993).

The third element of the tort requires that the plaintiff prove that the interference was both intentional and improper. The district court implicitly concluded that Fletcher's interference was justified because he was an agent of VOA and was acting on its behalf in terminating Bear's employment. Bear claims that Fletcher's interference was not justified because he was acting with an improper motive when he fired her for reporting his alleged misuse of funds to the VOA board.

In considering a claim of intentional interference with a contract which was brought by one employee against a co-employee, we stated: "An employee of a company is not liable for the company's breach of contract on the theory that the employee induced such breach if he acts in his official capacity, on behalf of the company, and not as an individual for his own advantage." *Davenport,* 744 P.2d at 1114. In other words, as long as the employee acted within the scope of his authority, his actions in recommending that another employee be discharged may be justified as a matter of law. *Dynan v. Rocky Mountain Federal Savings and Loan,* 792 P.2d 631, 641 (Wyo.1990).

VOA was aware of the problems between Bear and Fletcher when Fletcher recommended that Bear be discharged. After Fletcher reported to the Board the telephone call he had received concerning Bear's accusations, the Board independently determined Bear should be discharged and directed Fletcher to terminate her employment. A member of the Board of Directors attended the meeting where Fletcher informed Bear that her employment was being terminated. Under these facts, it is clear that, although Fletcher initiated the process which led to Bear's discharge, it was the Board of Directors that actually decided to fire her. Fletcher was simply acting as the Board's agent during the discharge process.

Bear's arguments concerning this claim are essentially the same as those supporting her other employment contract claims. "[A]n action of wrongful interference directed against an employee or an agent of one of the parties to the contract must merge into any action for breach of the contract because the act of the agent must be attributed to the principal." *Id. See also Davenport,* 744 P.2d at 1114. The district court, therefore, properly granted a summary judgment in favor of Fletcher on Bear's claim for intentional interference with a contract.

## Due Process

The district court granted summary judgment in favor of VOA on Bear's claim that she was deprived of a property interest without due process of law under 42 U.S.C. § 1983. The district court concluded that VOA acted under color of state law but that Bear did not have a property interest in her employment. Bear contends that she did have a property interest and that the district court erred by granting summary judgment in favor of Volunteers of America on her § 1983 due process claim. VOA argues that the district court improperly ruled that it was acting under color of state law. VOA did not, however, petition for a writ of review on the district court's ruling concerning whether or not it acted under color of state law and did not petition for a writ of review on its claims that the district court erred on Bear's freedom of speech and wrongful discharge claims. These issues are not properly before this Court at this time.

The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution protect individuals from arbitrary governmental deprivations of life, liberty, or property interests. *Mondt v. Cheyenne Police Department,* 924 P.2d 70, 74 (Wyo.1996); *City Council of Laramie v. Kreiling,* 911 P.2d 1037, 1045 (Wyo.1996). "The applicability of the constitutional guarantee of procedural due process depends in

the first instance on the presence of a legitimate 'property' or 'liberty' interest within the meaning of the Fifth and Fourteenth Amendments to the United States Constitution." *Mondt*, 924 P.2d at 74.

> "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . .
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

*Id.* (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

■■■■■ Property interests may be created by statute or by contract. *Id.* An individual may have a protected property interest in public employment if his contract entitles him to have continued employment in the absence of sufficient cause for discharge. *Id.* An implied-in-fact contract which requires "reasonable cause" before dismissal gives the employee a reasonable expectation of continued employment and, consequently, creates a property interest. *Abell v. Dewey*, 870 P.2d 363, 368 (Wyo.1994). An individual who has a property interest may not be deprived of that interest without being afforded the due process protections. *Id.*

In this case, we have determined that Bear did not have an employment contract for continued employment with VOA, and, therefore, we hold that she cannot have a protected property interest in her employment. We affirm the district court's order granting summary judgment on this issue.

*Punitive Damages*

Punitive damages cannot be awarded when compensatory damages cannot be recovered. *Cates v. Barb*, 650 P.2d 1159, 1161 (Wyo. 1982).

## CONCLUSION

Bear's at-will employment status was not modified, and she has not met the necessary elements to establish a claim of promissory estoppel, interference with a contract, due process or breach of an implied covenant of good faith and fair dealing. The district court properly granted summary judgment for VOA, and the order is affirmed.

MACY, J., files a concurring in part and dissenting in part opinion, with whom THOMAS, J., joins.

MACY, Justice, concurring in part and dissenting in part, with whom THOMAS, Justice, joins.

I believe that a genuine issue of material fact exists as to whether or not Petitioner Jodie Bear was an at-will employee. I, therefore, dissent from the portion of the majority opinion which affirmed the trial court's summary judgment on that issue. I concur with the remainder of the majority opinion.

Bear and Respondent Volunteers of America, Wyoming, Inc. agree that Bear was given a copy of the personnel policies when she was hired. Bear claims, however, that she does not remember having been presented with the first page of the personnel policies which contained the disclaimer. Volunteers of America asserts that Bear received a complete copy of the policies and was, therefore, bound by the disclaimer. The district court granted a summary judgment in favor of Volunteers of America on this issue, and the majority affirms the district court's decision.

The disclaimer in this case contained places for the employee and the supervisor to sign. The record is, however, devoid of a copy of a disclaimer signed by Bear. Bear averred that she was not asked to sign a copy of the disclaimer until March 1996 and that she refused to do so then. Additionally, a Volunteers of America board member stated in his deposition that, although employees were routinely asked to sign disclaimers when they were employed, he never saw a copy of a disclaimer signed by Bear. The employer, of course, is not legally required to have its employees sign disclaimers; howev-

er, the conspicuous absence of a disclaimer signed by Bear gives validity to Bear's contention that she did not receive the disclaimer.

The majority opines that whether or not an individual employee received actual notice of the particulars of her employer's personnel policies is irrelevant. The majority opinion cites *Nicosia v. Wakefern Food Corporation*, 136 N.J. 401, 643 A.2d 554 (1994), as being support for its determination that the entire personnel policies, including the disclaimer, was binding on Bear, even if she was personally unaware of them. The New Jersey Supreme Court held that an employee was bound by the entire employment manual even though the employee had actually seen only a relatively small portion of the manual. 643 A.2d at 558–59. The court reiterated many times, however, that it was important for the entire manual to be widely distributed to the employer's work force. *Id.*

The Wyoming Supreme Court has stated that an employment handbook may effectively rebut the presumption that employment is at-will and create an implied-in-fact contract for continued employment. *See, e.g., Loghry v. Unicover Corporation*, 927 P.2d 706 (Wyo. 1996). We have also held that a conspicuous, clear, and unambiguous disclaimer makes an employee's reliance on other provisions of a handbook unreasonable and effectively sustains the at-will employment status. *Lincoln v. Wackenhut Corporation*, 867 P.2d 701 (Wyo.1994). In determining whether a disclaimer is sufficient, we consider the disclaimer's prominence, its placement in relation to the other text in the manual, and the clarity of the disclaimer language. 867 P.2d at 703–04.

Volunteers of America's personnel policies included a list of causes for termination, a grievance procedure, and a probationary period for new employees. Its personnel policies, without the disclaimer, undoubtedly created an implied-in-fact contract for continued employment. Volunteers of America's work force was quite small. Evidence that one employee did not receive the disclaimer creates a factual question as to whether or not the entire personnel policies was widely distributed. Unless we are certain that the

entire personnel policies, including the disclaimer, was widely distributed to the work force, we should not make it applicable to Bear. I would, therefore, reverse the summary judgment and remand the case for a trial on this issue.